# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **ELI JACOB HANCOCK,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 1:20cv00046 |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **KILOLO KIJAKAZI,[1]** | ) | |
| **Acting Commissioner of** | ) | By: PAMELA MEADE SARGENT |
| **Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Eli Jacob Hancock, ("Hancock"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq*. Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is, therefore, substituted for Andrew Saul as the defendant in this case.

514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hancock protectively filed his application for SSI on June 18, 2018, alleging disability as of March 15, 2017, based on bipolar disorder; schizophrenia; paranoia; arthritis of the joints; acid reflux; and difficulty leaving his house and being around strangers. (Record, ("R."), at 12, 184-87, 206, 252.) The claim was denied, after which Hancock requested a hearing before an administrative law judge, ("ALJ"). (R. at 101-07.) A hearing was convened on September 4, 2019, at which Hancock was represented by a nonattorney representative. (R. at 46-56.) However, the ALJ postponed the hearing to obtain a consultative psychological evaluation, as representations were made that Hancock had multiple upcoming mental health appointments, and he had been without psychological treatment since January 2019. The hearing reconvened on January 8, 2020, at which Hancock again was represented by a nonattorney representative. (R. at 57-88.)

By decision dated January 31, 2020, the ALJ denied Hancock's claim. (R. at 12-20.) The ALJ found that Hancock had not engaged in substantial gainful activity since June 18, 2018, the application date.[2] (R. at 14.) The ALJ determined that Hancock had severe impairments, namely depressive disorder; bipolar disorder;

---

[2] The ALJ noted that Hancock worked after this date, but the work activity did not rise to the level of substantial gainful activity. (R. at 14.)

personality and impulse control disorder; and osteoarthritis, but he found Hancock did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-16.) The ALJ found Hancock had the residual functional capacity to perform medium[3] work, except he could lift and carry items weighing up to 50 pounds occasionally and up to 25 pounds frequently; he could sit, stand and walk for six hours; he could push/pull as much as the lift/carry restrictions; he could perform simple routine tasks with simple, short instructions and simple work-related decisions; he could tolerate occasional changes in the workplace; and he could not work at a production rate pace. (R. at 16.) The ALJ found Hancock was unable to perform his past relevant work. (R. at 19.) Based on Hancock's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Hancock could perform, including the jobs of a linen room attendant, a laundry worker I and a box bender. (R. at 19-20.) Thus, the ALJ concluded Hancock was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 20.) *See* 20 C.F.R. § 416.920(g) (2020).

After the ALJ issued his decision, Hancock pursued his administrative appeals, (R. at 317-22), but the Appeals Council denied his request for a review. (R. at 1-5.) Hancock then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2020). This case is before this court on Hancock's motion for summary

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2020).

judgment filed March 9, 2021, and the Commissioner's motion for summary judgment filed April 7, 2021.

## II. Facts

Hancock was born in 1980, (R. at 184), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). He has a high school education and training in masonry, and he has past work experience as a general laborer and a forklift truck operator. (R. at 19, 62, 207.) At the January 2020 hearing, he testified he attended special education classes,[4] and he had some problems writing, stating he could sign his name, but describing it as "chicken scratch." (R. at 62-63.) Hancock stated he could read the letters sent to him by the Social Security Administration, but he did not fully understand them, noting his wife helped him read them. (R. at 63.) He further testified he could "barely" make change, and he had a checking account once, but his mother managed it. (R. at 63.) Hancock also stated an individual at the Social Security Office helped him complete his application, and a mental health caseworker and his wife helped him complete various forms. (R. at 68-69.) However, he stated he filed for food stamps on his own. (R. at 68.) Hancock stated he had not worked for pay or profit since March 15, 2017. (R. at 63.) While the ALJ noted some "minimal" work in 2018, which Hancock stated was at a fast food restaurant for a "couple of weeks," he found it was not substantial gainful activity, and he was "not

---

[4] On his Disability Report, Hancock indicated he attended special education classes throughout high school. (R. at 207.) In May 2018, he reported being in special education for "everything" due to attention deficit disorder, ("ADD"). (R. at 362.) In July 2018, Hancock reported being in special education for math and English, and he stated his grades were "fair." (R. at 450.) In September 2019, he reported graduating from high school in regular classes, but being retained in eighth grade. (R. at 970.) In October 2019, Hancock reported being in special education classes throughout his school years and being diagnosed with attention deficit hyperactivity disorder, ("ADHD"), in sixth or seventh grade. (R. at 978.)

going to worry about it." (R. at 63-64.) Hancock stated he could not currently work because he was "deemed disabled" by the consultative examiner, and he did not "work well with others." (R. at 70.)

According to Hancock, he suffered from mental illness since the age of 16. (R. at 70.) He lived with his parents, who supported him, until he was 30 or 31, at which time he moved to Tennessee to work for his brother. (R. at 72-73.) He stated he filed for disability in 2018 after his wife was injured in a "major wreck," which worsened his mental illness. (R. at 71.) Hancock described his mental illness as not liking being around people and preferring to stay to himself. (R. at 72.) He endorsed daily anxiety, worsened by going out, and he stated he had suffered from paranoia for "years," reporting he felt like everyone was out to get him. (R. at 73-74.) He admitted to having anger and violence issues in the past due to depression. (R. at 74.) Hancock also reported having memory issues for a couple of years, stating it was difficult for him to focus. (R. at 74.) However, other than recently, he stated he had not been in mental health treatment. (R. at 72.) Specifically, he stated he received treatment while living in Missouri, and he currently had seen a psychiatrist three times, who had prescribed medications, but he did not know what the psychiatrist's diagnoses were. (R. at 75.) Hancock testified he had begun having some obsessive-compulsive symptoms over the prior couple of years, including constantly washing his hands and doing things in "threes." (R. at 76-78.) He also stated he did not like having his face touched, and if his wife did this, he washed it. (R. at 77.) Hancock stated Rexulti previously had been helpful, but his insurance would no longer pay for it. (R. at 78-79.) He admitted hearing voices about every other day, which medication had helped "somewhat." (R. at 79-80.) Hancock testified that, for the previous couple of years, he stayed tired, but prior sleep issues had improved with medication. (R. at 78.) He testified he had been hospitalized twice for mental health

- 5 -

issues and drug addiction, but he was not currently using illegal drugs and had not done so for two years. (R. at 71.)

Hancock testified he spent his days at home doing light cooking, a little cleaning and spending time with his wife. (R. at 81.) He stated he grocery shopped with his wife once monthly. (R. at 81.) Hancock denied visiting with anyone, and he stated he had no friends. (R. at 82.) He said he had somewhat of a relationship with his family, noting he talked to his sister more than anyone else. (R. at 82.) Hancock testified he was 5 feet 5 inches tall and weighed approximately 120 pounds. (R. at 80.) He stated he had no appetite, and he suffered from acid reflux, for which he took Zantac. (R. at 80.) Hancock also stated he had joint pain, including in his back and knees, for which he took medication that helped his pain. (R. at 81.)

Timothy Whitford, a vocational expert, also testified at Hancock's hearing. (R. at 83-87.) He classified Hancock's past work as a composite job, consisting of the jobs of a general laborer, generally performed at the heavy[5] level of exertion, and a forklift truck operator, generally performed at the medium level of exertion. (R. at 83.) Whitford testified that, overall, this work was medium as Hancock actually performed it. (R. at 84.) Whitford testified that a hypothetical individual of Hancock's age, education and work history, who could perform medium work that required no more than occasional lifting and/or carrying of items weighing up to 50 pounds, frequent lifting and/or carrying of items weighing up to 25 pounds; sitting, standing or walking for six hours each; occasional workplace changes; performing simple, routine tasks with simple, short instructions and making simple work-related

---

[5] Heavy work involves lifting items weighing no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. § 416.927(d) (2020).

decisions; occasionally interacting with supervisors, co-workers and the public; and no work at a production rate pace, could not perform Hancock's past work. (R. at 84-85.) However, Whitford testified this individual could perform other jobs existing in significant numbers in the national economy, including those of a linen room attendant, a laundry worker I and a box bender. (R. at 86.) Whitford testified the same hypothetical individual, but who also would be off task 15 percent of the workday in addition to normal breaks and who would be absent twice monthly, could not perform any jobs. (R. at 86.) Whitford testified that either an off-task rate in excess of 10 percent or monthly absences in excess of one day would be work preclusive. (R. at 86.) Whitford stated his testimony was consistent with the information contained in the Dictionary of Occupational Titles, ("DOT"), with the exception of the off-task rates, absenteeism rates and interaction with the public, supervisors and co-workers, which are not discussed in the DOT, but was based on his experience. (R. at 87.)

In rendering his decision, the ALJ reviewed records from Dr. Denise R. Trowbridge, M.D., a state agency physician; Kim Dempsey, Psy.D., a state agency psychological consultant; The Laurels; Nevada Regional Medical Center; Mercy Hospital; Compass Health; Dr. Rick D. Casey, D.O.; Holston Medical Group, ("HMG"); C-Health of St. Paul; Pathways Behavioral Health Center, ("Pathways"); Mercy Clinic El Dorado Springs, ("Mercy Clinic"); Melinda M. Fields, Ph.D., a licensed clinical psychologist; and William A. Davis Clinic.

On March 10, 2010, Hancock was admitted for residential recovery services at The Laurels after experiencing increased depression and suicidal ideation. (R. at 657-60.) He reported daily marijuana use since the age of 16 and cocaine use for about a year, but which he had not used for two or three months. (R. at 657.) Hancock

- 7 -

had a flat affect and a depressed mood, intact orientation and memory, impaired concentration and poor insight and judgment. (R. at 657-58.) A prior diagnosis of bipolar disorder was noted, and his then-current Global Assessment of Functioning, ("GAF"),[6] score was placed at 50.[7] (R. at 661.) While there, Hancock participated in counseling, as well as local Narcotics Anonymous, ("NA"), meetings. (R. at 671-719.) His diagnoses included bipolar disorder; drug withdrawal syndrome; major depressive disorder, recurrent; anxiety disorder, not otherwise specified; polysubstance dependence; and cocaine dependence, and he was placed on various medications, including Paxil, Vistaril, Buspar and Trazodone. (R. at 662-66.) Hancock was discharged on March 30, 2010. (R. at 666.)

On May 2, 2018, Hancock presented for an initial visit to Pathways after moving to Missouri to live with his girlfriend two weeks previously. (R. at 352.) He reported long-standing mental health issues, including bipolar depression. (R. at 352.) Hancock reported daily suicidal thoughts, but denied then-current suicidal ideation, stating the last time he tried to harm himself was two years previously by overdosing on his medications. (R. at 352.) He reported not being on any medications at that time, and he denied a history of substance abuse. (R. at 352.) He reported having very few friends and staying to himself, as well as paranoia and thinking people were out to get him. (R. at 361.) He stated he could read and graduated high school, but was in special education for "everything," and later

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7] A GAF score of 41 to 50 indicates the individual has "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

stating he was in such classes for ADD. (R. at 361-62.) Hancock further reported he was a certified mason. (R. at 361.) On examination, Hancock was fully oriented, rational and sober; he communicated well; his memory was intact; his mood was depressed;[8] he was sometimes tearful; he had normal eye contact; his manner, attitude and conduct were appropriate and cooperative; speech was linear and goal directed; impulse control was normal; thought process was normal; judgment and insight were fair; energy level was normal; there were no signs or symptoms of delusions or hallucinations or of developmental disabilities; and he denied suicidal ideation. (R. at 352, 378.) Hancock's Work and Social Adjustment Scale score indicated moderately severe to severe impairment due to an underlying mental illness. (R. at 352.) The Patient Health Questionnaire indicated severe depressive symptoms, and the Generalized Anxiety Disorder scale indicated severe anxiety symptoms. (R. at 352.) Hancock reported no medical problems. (R. at 353.) He was diagnosed with bipolar depression and generalized anxiety disorder, and his then-current GAF score was placed at 38.[9] (R. at 353, 362.) Hancock was admitted to the Pathways outpatient program for case management, counseling and medication management. (R. at 353.) He expressed wanting help with depression, anger, anxiety and mood swings. (R. at 380, 388, 394, 396.)

At a counseling session on May 18, 2018, with Nancy Maenhoudt, LCSW, a licensed clinical social worker, Hancock was appropriately dressed and groomed; he had normal eye contact; appropriate and cooperative manner and attitude; linear and

---

[8] At another point on the same day, Hancock's mood was described as normal with a congruent affect. (R. at 378.)

[9] A GAF score of 31 to 40 indicates the individual has "[s]ome impairment in reality testing or communication … OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. …" DSM-IV at 32.

goal-directed speech; normal mood with congruent affect; normal impulse control; fair judgment and insight; no signs or symptoms of delusions or hallucinations or of developmental disabilities; normal energy level; and no suicidal ideations. (R. at 394.) He reported an increased appetite and tiredness with his anxiety medication, and he stated his sleep was "not good at all." (R. at 394.) He also reported being his girlfriend's primary caretaker for the previous three years after she was involved in a serious motor vehicle accident. (R. at 394.)

On May 22, 2018, Hancock saw the psychiatrist at Pathways, Dr. Melissa Jones, D.O., reporting that recently prescribed anxiety medication was helping, after not having taken mental health medication for 10 years. (R. at 400, 403.) He endorsed mood swings, depression and stress over caring for his fiancée; not wanting to leave his home due to paranoia; hearing voices; periods of anger, during which he would throw and break things; constant worry and obsessive thoughts; checking doors and windows and constantly cleaning and washing his hands after touching things; and poor sleep. (R. at 400.) He denied suicidal ideations for "a few months," and he stated he had not used marijuana in "a few months." (R. at 400.) On mental status examination, Hancock was cooperative, pleasant and fully oriented; he had good hygiene; normal speech; a down mood with a full affect; no evidence of paranoid thoughts; linear and goal-directed thought process; intact memory; good concentration; good eye contact; fair insight and judgment; and average intelligence. (R. at 401.) Dr. Jones diagnosed bipolar manic-depressive illness, ("BMDI"); obsessive compulsive disorder, ("OCD"); and marijuana abuse, and she placed Hancock's then-current GAF score at 48. (R. at 401-02.) She continued Vistaril, and she prescribed Risperdal and Celexa. (R. at 402.)

When he returned to Maenhoudt for counseling on May 24, 2018, Hancock's mental status examination was largely normal and similar to the previous examination, except it also was noted he had normal thought process; full orientation; normal memory; and no delusions, hallucinations or developmental disabilities. (R. at 405.) He described "terrible sleep," although he slept through the night the previous night after starting sleep medication. (R. at 405.) Hancock continued to report feelings of paranoia, self-isolation and ongoing irritability and breaking things when angry. (R. at 405.) He reported "black outs," during which he did not remember what he did or said. (R. at 405.) Anger management skills were discussed. (R. at 405.) In May 2018, Hancock's in-home supportive services worker, Larry Hicks, educated him on anxiety, depression and anger management. (R. at 388, 390, 398.) On May 29, 2018, Hancock's fiancée advised Hicks he was exhibiting psychotic behaviors. (R. at 409.) Hancock stated he was fine, he declined help, and he asked Hicks to leave. (R. at 409.)

During an Initial Assessment on June 1, 2018, Hancock reported two prior suicide attempts – one at age 23 and another at 30. (R. at 365.) On examination, he was nervous with congruent affect; impulse control and thought process were normal; he was fully oriented; memory was normal; judgment and insight were fair; there were no signs or symptoms of delusions, hallucinations or developmental disabilities; he was tired; and he had no suicidal ideations. (R. at 365.) Testing again indicated moderately severe to severe impairment due to an underlying mental illness; severe depressive symptoms; and severe anxiety symptoms. (R. at 365.) Hancock again reported he was not taking any medications, and he reported no medical problems. (R. at 366.) It was noted that Hancock was impulsive, and he did not stay on his medications regularly. (R. at 368.) Hancock stated he had no social life. (R. at 369.) He stated he needed help getting disability benefits, but he also

stated he wanted to get a job. (R. at 370.) Hancock was diagnosed with bipolar disorder, unspecified; and generalized anxiety disorder. (R. at 370.) It was noted he could read and write. (R. at 370.)

Hancock continued to receive in-home supportive services, counseling and medication management through the end of 2018. Hicks continued to educate Hancock on things like mood management, relapse prevention, anxiety management and stress management. (R. at 413, 726, 728.) He advised Hicks he wanted to file a disability claim. (R. at 413.) In June 2018, Hancock stated his urges to use drugs were less frequent, and he felt "a lot better." (R. at 434.) Later that month, he reported a few night terrors and one incident during which his fiancée said he was yelling strange things out the window, but he told Hicks he had run out of Trazodone. (R. at 436.) By the following month, Hancock told Hicks he was better after a medication change, and he wanted to be able to manage his anxiety so he could do more things. (R. at 726.) He also said he thought his depression would improve if he had a vehicle to get out and do more things he enjoyed; he could not relax enough to engage in relaxation techniques; he had frustration about things not going his way; and he had not thought about using drugs. (R. at 499, 733, 735, 737.) On August 2, 2018, Hancock stated his depression had been a lot better. (R. at 739, 743.) Hancock was married on August 11, 2018, and he reported not feeling as depressed and not having urges to use substances. (R. at 753.) He listed his coping skills as deep breathing, cooking, cleaning, listening to music and taking walks. (R. at 521, 745, 769.) On August 14, 2018, Hancock reported being in a "pretty good mood" lately, but later that month, he stated his electricity had been turned off because he could not pay his bill after he loaned money to family who never repaid him. (R. at 515, 527, 531.) On August 30, 2018, Hancock reported regular mood swings due to a lack of money to go to the movies or go fishing. (R. at 771.) Nonetheless, the next day, he reported

mostly staying in his home due to anxiety. (R. at 773.) He stated his current medications seemed to be working better, and he planned to go fishing and maybe get a job when he got his anxiety controlled. (R. at 773.) Nevertheless, he stated he was appealing the denial of his disability claim. (R. at 773.)

In September 2018, Hancock denied his wife's allegation that he had used methamphetamine, but he admitted using marijuana. (R. at 778, 782.) He reported stress due to an inability to pay his rent and having nowhere to go if evicted, as well as poor communication with his wife and his wife not taking things seriously. (R. at 778, 786, 788, 792.) Hancock stated he planned to attend weekly NA meetings. (R. at 782.) On September 14, 2018, Hancock said he had been too depressed to leave his home, but he felt better after taking a short walk with Hicks. (R. at 784.) About a week later, Hancock stated he would be happier and less stressed and depressed if he had a car and could move closer to family. (R. at 788.) He stated he had enjoyed a trip to the river, which he would like to do more. (R. at 788.) On September 24, 2018, Hancock reported throwing and breaking his phone and saying mean things to his wife, but he admitted he was not taking his medication as prescribed. (R. at 790.) He stated he felt much better when he was compliant. (R. at 790.) The next day, Hancock mentioned the possibility of getting a part-time job, but he also stated he was disabled due to mental problems. (R at 792, 794.)

During October 2018, Hancock reported having several family members living with him in a small trailer and having no place to go, which was resulting in a lot of anxiety and angry outbursts. (R. at 560, 796, 806, 810.) He reported depression and anxiety due to finances and his wife's health issues. (R. at 560, 796, 801.) Hancock again reported cleaning and listening to music helped his depression. (R. at 801.) On October 15, 2018, he was very quiet and gave one- or two-word

responses, but the next day, he stated his medications were helping a lot. (R. at 805-06.) In November 2018, Hancock reported continued stress and mood swings due to extra family living in his home who would not contribute financially. (R. at 814.) On November 12, 2018, a Wellness Plan Review was completed for the upcoming 12-month period, during which Hancock stated he wanted to learn new skills to manage his depression. (R. at 481.) On December 20, 2018, he advised he was moving to Virginia the next day to care for his grandfather. (R. at 823.) Although he was given a list of medical doctors and mental health facilities in the area, Hancock was not receptive to the referral information. (R. at 823, 825.)

During counseling services with Maenhoudt, Hancock's mental status examination findings remained largely unremarkable, including normal eye contact; a normal mood with congruent affect; normal memory; an appropriate and cooperative manner, attitude and conduct; linear and goal-directed speech; normal impulse control; normal thought process; full orientation; fair judgment and insight; no signs or symptoms of delusions or hallucinations or developmental disabilities; normal energy level; good sleep; and no suicidal ideations. (R. at 422, 430, 741.) On June 13, 2018, he stated his medication since a recent psychiatric hospitalization had been very helpful, and he reported no angry outbursts or feelings of frustration. (R. at 422.) Hancock hoped to start work in the next couple of weeks. (R. at 422.) On June 21, 2018, he stated he had not had any cycling or anger issues since a medication change, but he reported OCD symptoms, including having to do things in threes. (R. at 430.) On August 2, 2018, Maenhoudt noted Hancock was in a positive mood and excited about his upcoming wedding. (R. at 741.) He denied stressors, and he reported his mood was stable and good, noting it had been a long time since he had done so well. (R. at 741.) Hancock also stated his depression had

been a lot better. (R. at 743.) He did not show for counseling sessions on August 10 and October 17, 2018. (R. at 593-94.)

During medication management appointments throughout 2018,[10] Hancock repeatedly exhibited normal mental examination findings, despite his various mental health complaints, which included OCD symptoms, anxiety symptoms, depression symptoms, paranoia, worry, nightmares, auditory hallucinations, isolating at home and mood swings. In particular, Hancock's mental status findings typically showed he was alert, fully oriented, cooperative and pleasant, with good hygiene, a euthymic mood and a full affect. (R. at 418, 452, 457, 833, 838, 843, 847-48.) There was no evidence of paranoia, thought process was linear and goal directed, memory was intact, concentration and eye contact were good, psychomotor activity was normal, insight and judgment were fair to normal, and intelligence was average. (R. at 418, 443, 452, 457, 833, 838, 843, 847-48.) On June 12, 2018, Dr. Jones diagnosed BMDI; OCD; methamphetamine dependence; and THC abuse, and she placed his then-current GAF score at 48. (R. at 418.) She increased Hancock's Lamictal dosage and continued his other medications. (R. at 418-19.) On July 3, 2018, Hancock reported doing better with the increased Lamictal, but still felt anxious. (R. at 442.) He reported a stable mood with no recent depression, mania, hallucinations, paranoia or suicidal ideation, and he was sleeping well. (R. at 442.) Hancock's diagnoses and GAF score remained the same, and Dr. Jones again increased the Lamictal dosage, prescribed Cogentin and continued Paxil and Geodon. (R. at 442-43.)

---

[10] Beginning on July 11, 2018, Hancock saw Cynthia Keene, APRN, a psychiatric advanced practice registered nurse at Compass Health, for mental health medication management. (R. at 449.)

On July 11, 2018, Hancock rated his depression a two on a 10-point scale, he denied suicidal ideation, he stated his auditory and visual hallucinations had improved with Geodon, and he endorsed an anxious and depressed mood, paranoia, racing thoughts, two or three monthly manic spells, a quick temper, worrying, having nightmares and sleepwalking and OCD symptoms. (R. at 449-52.) Hancock stated he used marijuana to calm himself, but he denied methamphetamine use since June 8, 2018. (R. at 450.) He reported he graduated from high school, he was in special education classes for math and English, and his grades were "fair." (R. at 450.) Hancock enjoyed being outside, watching television and playing with his dog. (R. at 450.) He reported working odd jobs since completing high school, mostly in construction, and he reported his strong work ethic to be a functional strength. (R. at 450.) Keene diagnosed bipolar disorder, current episode mixed, severe, with psychotic features. (R. at 452.) Hancock's bipolar disorder and anxiety both were described as chronic and either stable or improved. (R. at 453.) He was continued on Lamictal and Geodon, Ambien was paused due to sleepwalking, and fluvoxamine was begun. (R. at 453.) However, when he returned on July 19, 2018, he stated he quit taking the fluvoxamine because it made him sick. (R. at 455.) Hancock reported improved sleep, he denied sleepwalking since discontinuing Ambien, he rated his depression a zero on a 10-point scale, he denied irritability, agitation and suicidal ideation, he reported an improved mood with less racing thoughts, and he reported only mild paranoia. (R. at 455-56.) Hancock wished to try new medication for some continuing anxiety. (R. at 455.) Keene discontinued fluvoxamine and Ambien, she continued Geodon, and she prescribed Paxil and Vistaril. (R. at 458.)

By August 2, 2018, Hancock advised Keene he was doing well, and his medications were working well, including Paxil, which helped his depression. (R. at 831.) In fact, Hancock denied current depression. (R. at 831.) He reported good

energy; good concentration; sleeping well; good mood without mood swings; no worry, anxiety or nightmares; no psychotic symptoms, including hallucinations, paranoia or delusions; and he denied suicidal ideation. (R. at 831.) Keene's diagnosis remained the same, and she continued Hancock on medications. (R. at 834.)

On September 13, 2018, Hancock advised Keene he had a rough week, and his wife stated he had been paranoid, they had been fighting, and he had asked her for a divorce. (R. at 836.) Nonetheless, he denied feeling depressed, rating his depression a three on a 10-point scale. (R. at 836.) Hancock did endorse racing thoughts, mood swings, some anxiety and hearing voices. (R. at 836.) Keene's diagnosis remained unchanged, and she discontinued Paxil, prescribed Remeron, increased the Vistaril dosage and continued his other medications. (R. at 839.) She also advised Hancock to cut down on caffeine, nicotine and cannabis. (R. at 839.) On October 10, 2018, Hancock told Keene he needed his medications changed, noting he did not feel depressed, but had "nerve problems." (R. at 841.) He admitted to continued cannabis use. (R. at 842.) Keene discontinued Remeron, increased Lamictal, Geodon and Cogentin and added Rexulti. (R. at 844.) On October 24, 2018, Hancock reported things were better, rating his depression a two; he denied irritability; he was sleeping better; he had a good appetite and energy level; his mood had been good, without highs or lows or racing thoughts; and he denied anxiety, psychotic symptoms, suicidal ideations and illicit substance abuse. (R. at 846.) Keene's diagnosis remained the same, and she continued Hancock's medication regimen. (R. at 848-49.)

Hancock was formally discharged from services at Pathways on January 18, 2019. (R. at 851.)

Also during 2018, Hancock presented to the emergency department at Nevada Regional Medical Center for a psychiatric evaluation. (R. at 323.) On June 4, 2018, he reported his mental status had been "bad" ever since starting new medications approximately two weeks previously. (R. at 323.) However, he also stated he had run out of his medications toward the end of May because his brother flushed them down the toilet, stating "they weren't helping." (R. at 327.) Nonetheless, Hancock reported that, without the medications, he was more depressed and having suicidal thoughts, hearing voices and not eating or sleeping. (R. at 323, 327.) He was diagnosed with depression, admitted to the psychiatric unit and started on Olanzapine. (R. at 323-24.) He was alert and in moderate distress, and a drug screen was positive for THC. (R. at 324, 327.) Upon arriving at the behavioral health unit, he was guarded and uncooperative, but he refused medication for agitation. (R. at 327.) That evening, staff observed Hancock responding to internal stimuli and talking to unseen others. (R. at 327.) He continued to have behavioral outbursts, and he was described as "very uncooperative." (R. at 327.) Hancock denied medical problems. (R. at 328.) Dr. David Ray Trobaugh, M.D., diagnosed Hancock with bipolar disorder I and intermittent explosive disorder, he prescribed Lamictal, Paxil and Geodon, and he deemed Hancock's prognosis as guarded. (R. at 328.) Hancock reported Neurontin, Paxil and Geodon had helped him in the past. (R. at 330.) By June 6, 2018, Hancock was not nearly as agitated, and Dr. Trobaugh added major depression, recurrent, to his diagnoses. (R. at 330.) The next day, Hancock reported an improved mood after being on medication for not even a full day, and Dr. Trobaugh noted he was smiling, which he had not done before. (R. at 334.) Hancock voiced no other problems. (R. at 334.) On mental status examination, he was less depressed with a brighter affect. (R. at 334.) Hancock was discharged with a euthymic mood with medication. (R. at 337.) Dr. Trobaugh continued Lamictal,

Paxil and Geodon. (R. at 337.) Due to a "history of noncompliance with medication," Hancock's prognosis was deemed guarded. (R. at 338.)

Also during 2018, Hancock treated with Dr. Ricky D. Casey, D.O., his primary care physician at Mercy Clinic. On May 15, 2018, Hancock reported worsened anxiety, but he was mentally alert, with adequate speech, no thought or cognitive problems, no suicidal ideation or hallucinations and a satisfactory mood. (R. at 348-49.) Dr. Casey diagnosed Hancock with anxiety state and bipolar affective disorder, remission status unspecified, and he prescribed Vistaril. (R. at 349.) On June 18, 2018, Hancock reported improved depression, and his mental status examination was unchanged. (R. at 348, 428.) Physical examination showed lateral movement, drawers and pivot shift of the knees were normal with mild pain on range of motion; mild effusion; moderately decreased range of shoulder motion with pain to palpation over the rotator cuff; and positive Neer's and empty can tests. (R. at 348.) Dr. Casey's diagnoses included arthralgia of an unspecified joint; GERD; bipolar affective disorder, remission status unspecified; and paranoid schizophrenia. (R. at 348.) On July 2, 2018, Hancock's mental status, again, was unchanged and normal. (R. at 347.) He reported a moderate flare of insomnia, for which Dr. Casey prescribed Ambien. (R. at 346-47.) However, on July 10, 2018, Hancock called Dr. Casey's office, stating the Ambien was not working. (R. at 345.) On July 30, 2018, Hancock advised Dr. Casey he was disabled due to psychiatric issues. (R. at 471.) He was mentally alert. (R. at 472.) Dr. Casey's diagnoses remained the same. (R. at 472.) Also on this date, Dr. Casey wrote a letter "To whom it may concern," stating Hancock had a lifelong medical need for assistance with food stamps and medical care due to a diagnosis of major psychiatric illness. (R. at 875.) Hancock continued to treat at Mercy Clinic through March 29, 2019, for medication refills for arthralgia, GERD, bipolar disorder and paranoid schizophrenia. (R. at 859-967.) However,

except for the July 30 treatment note, these notes do not contain physical or mental status examination findings. (R. at 953.)

On August 14, 2018, Dr. Denise R. Trowbridge, M.D., a state agency physician, completed a medical evaluation in connection with Hancock's initial disability claim. (R. at 93.) She found he had no severe physical impairment. (R. at 93.) On the same day, Kim Dempsey, Psy.D., a state agency psychological consultant, completed a Psychiatric Review Technique form, ("PRTF"), finding Hancock was mildly limited in his ability to understand, remember or apply information and to adapt or manage himself. (R. at 94-95.) She found he was moderately limited in his ability to interact with others and to concentrate, persist or maintain pace. (R. at 94.) Dempsey also completed a mental residual functional capacity assessment of Hancock, finding he was moderately limited in his ability to understand, remember and carry out detailed instructions; to work in coordination with or in proximity to others without being distracted by them; and to interact appropriately with the general public. (R. at 96-98.) She opined he could understand and remember simple instructions; sustain concentration, persistence and pace on simple tasks; and would do best with limited social contact. (R. at 97-98.) In all other areas of mental functioning, Hancock was found to be not significantly limited. (R. at 97-98.)

Hancock saw Dr. Brian Easton, M.D., at C-Health of St. Paul, on April 4, 2019, to establish new patient status after returning to Virginia from Missouri. (R. at 630.) He complained of mild GERD, doing well on medication; a diagnosis of unspecified schizophrenia; and a history of diffuse osteoarthritis, stable and nonprogressive, which meloxicam was helping. (R. at 630.) Hancock voiced no physical or psychiatric complaints at that time, and an examination yielded

completely normal findings, including a normal gait, normal muscle tone and strength, normal sensation, full orientation and an appropriate affect and demeanor. (R. at 630-31.) Dr. Easton diagnosed Hancock with GERD, unspecified schizophrenia and osteoarthritis of multiple sites, and he refilled all his medications, including Rexulti, Lamictal and meloxicam. (R. at 631-32.) Dr. Easton also referred Hancock to a psychiatrist. (R. at 632.) When he returned on July 29, 2019, Hancock did not endorse anxiety, depression, sleep disturbance or suicidal thoughts. (R. at 853.) His GERD was described as mild and improved with medication, and his osteoarthritis was described as stable and nonprogressive with meloxicam. (R. at 853.) Examination, again, was normal, including a normal gait, full orientation, an appropriate affect and demeanor and good insight and judgment. (R. at 854.) Dr. Easton diagnosed generalized anxiety; GERD; osteoarthritis of multiple sites; and chronic paranoid schizophrenia, and he continued Hancock on medications. (R. at 854-55.) A referral for psychiatry was resent. (R. at 855.)

On September 26, 2019, Melinda M. Fields, Ph.D., performed a consultative psychological evaluation of Hancock at the request of Disability Determination Services. (R. at 968-72.) Hancock reported intermittent depression, nervousness and a history of auditory hallucinations beginning in adolescence and continuing daily. (R. at 968-69.) He reported hearing voices telling him to kill himself and feeling that people were out to get him. (R. at 969.) He also endorsed middle insomnia; inconsistent appetite; low self-esteem; history of suicidal ideation, most recently three months earlier with a plan to hang himself or overdose; and a history of anger outbursts. (R. at 969.) He stated he spent his time in his home watching television. (R. at 969.) Hancock stated he purchased groceries with his wife and prepared convenience foods; he washed dishes; he was responsible for his own hygiene; he managed the household finances; he visited a maternal uncle in a nursing home, but

no one else; and he was not involved in church, civic or community activities. (R. at 969.) Hancock described his social functioning as impaired. (R. at 969.)

Hancock stated he graduated from high school in regular classes, but he was retained in the eighth grade, and he obtained a driver's license without assistance. (R. at 970.) On mental status examination, Hancock had adequate hygiene/grooming; he was cooperative and put forth adequate effort throughout; he presented as a poor historian; he did not appear to have difficulty comprehending questions; eye contact was adequate; speech was normal, but one-word responses were typical; he was fully oriented; his mood was unremarkable, but he said he was nervous; his affect was blunted; there were no thought process impairments; thought content was void of delusions, preoccupations, obsessions or phobias; there was no evidence of hallucinations or delusions; insight and judgment were limited; he denied suicidal and homicidal ideations; immediate memory was not impaired, but recent and remote memory were impaired; psychomotor behavior was normal; concentration was impaired, as Hancock generated Serial 3's with four errors; persistence was fair; and pace was normal. (R. at 971-72.) Fields opined that social functioning during the exam was impacted by one-word responses and a blunted affect. (R. at 972.) She diagnosed unspecified schizophrenia spectrum and other psychotic disorder, provisional; rule out schizophrenia, paranoid presentation; rule out unspecified bipolar disorder and related disorder; intermittent explosive disorder, by report; and cannabis use disorder, by history and by report. (R. at 972.) Fields opined Hancock might have difficulty completing a typical workday or workweek at that juncture due to psychiatric symptoms and that his ability to successfully navigate stressors inherent in gainful employment, including the need to interact appropriately with others, appeared unlikely. (R. at 972.) She deemed his prognosis as guarded with appropriate treatment and environmental support. (R. at 972.)

Fields also completed a mental assessment of Hancock, finding he was moderately limited in his ability to understand, remember and carry out simple instructions; and markedly limited in his ability to make judgments on simple work-related decisions, to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with the public, supervisors and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 975-77.) She stated her findings were supported by Hancock's impaired recent and remote recall, impaired concentration, impaired judgment, impaired social functioning, auditory hallucinations and her behavior observations on that date. (R. at 975-76.)

On October 15, 2019, Hancock saw Emily C. Steffey-Stacy, PMHNP, a psychiatric mental health nurse practitioner at the William A. Davis Clinic, for mental health evaluation and treatment at Dr. Easton's referral. (R. at 978.) He reported being in special education classes throughout his school years and being diagnosed with ADHD in sixth or seventh grade. (R. at 978.) Hancock reported a prior diagnosis of bipolar disorder and hearing voices and being paranoid as he got older. (R. at 978.) He endorsed physical symptoms, including back pain, leg pain, joint pain and tremors, and he endorsed mental symptoms, including depression, difficulty concentrating, feeling anxious, excessive worrying, becoming easily irritated and feeling afraid. (R. at 978-79.) Hancock reported hearing voices that told him to kill himself, and he reported intermittent suicidal ideation. (R. at 979.) He stated when taking Geodon and Rexulti together, he did not hear voices, but he had been off Rexulti for a couple of months because his insurance would not cover it. (R. at 979.) He denied audiovisual hallucinations at that time. (R. at 979.) On mental status examination, Hancock was well groomed and dressed appropriately; his mood was "good," and he denied current depression and anxiety; behavior was congruent

- 23 -

with his mood and the situation; eye contact, insight, judgment and speech were normal; he denied suicidal or homicidal ideation; he was fully oriented; he reported hearing voices and seeing people at times; and he reported paranoia, stating, "people are out to get me." (R. at 979-80.) Hancock was in no acute distress, he was ambulatory without any assistive devices, he had normal muscle tone, bulk and strength, there were no abnormal movements, rigidity, spasticity or flaccidity, and his gait was normal. (R. at 982.) Steffey-Stacy diagnosed generalized anxiety disorder; schizoaffective disorder, bipolar type; borderline intellectual functioning; sleep disorder, unspecified; fatigue; and low back pain, among other things. (R. at 982-83.) Testing revealed severe depression and anxiety. (R. at 983-84.) Steffey-Stacy continued Hancock on Geodon, Lamictal and Vistaril, and she prescribed Remeron. (R. at 984.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2020). *See also Heckler v. Campbell,* 461 U.S. 458, 460-62 (1983); *Hall v. Harris,* 658 F. 2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

Hancock argues the ALJ erred by failing to resolve an apparent conflict between the vocational expert's testimony and the DOT. (Plaintiff's Memorandum In Support Of Summary Judgment, ("Plaintiff's Brief"), at 11-13.) He also argues the ALJ erred by failing to develop the record related to his educational background and his work experience. (Plaintiff's Brief at 8-11.) Lastly, Hancock argues the ALJ erred in his consideration of the evidence, particularly, consultative examiner Fields's opinion and the sworn statement provided by his wife. (Plaintiff's Brief at 4-8.)

At step five of the sequential disability evaluation, the ALJ has the burden to demonstrate there is other work, existing in significant numbers in the national economy, that a claimant can perform, given his residual functional capacity. *See* 20 C.F.R. §§ 416.920(a)(4)(v) (2020), 416.960(c) (2020) and 416.966 (2020); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). One way an ALJ can meet this burden is through the use of vocational expert testimony. *See* SOCIAL SECURITY RULING, ("S.S.R."), 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). If an ALJ cannot satisfy this burden at step five, the claimant is entitled to a finding of disability. Also at step five, the ALJ has a duty to identify any apparent conflicts between the vocational expert's testimony and the DOT. *See* S.S.R. 00-4p, 2000 WL 1898704, at *2. The Fourth Circuit clarified that "the *ALJ* (not the vocational expert)" is required to "'[i]dentify *and* obtain a reasonable explanation' for conflicts between the vocational expert's testimony and the [DOT]. …" *Pearson v. Colvin*, 810 F.3d 204, 208 (4th Cir. 2015) (emphasis in original). The Fourth Circuit limited the ALJ's duty to identifying "apparent" conflicts, which it held to mean "that the ALJ must identify where the expert's testimony seems to, but does not necessarily, conflict with the [DOT]. For the Ruling [S.S.R. 00-4p] explains that '[i]f the [vocational expert]'s … evidence *appears to conflict* with the [DOT], the adjudicator will obtain a reasonable explanation for the *apparent* conflict.'" *Pearson*, 810 F.3d at 209 (emphasis in original). If such an apparent conflict is not resolved, the ALJ may not rely on the vocational expert evidence to support a disability determination. *See* S.S.R. 00-4p, 2000 WL 1898704, at *2.

Here, the ALJ relied on testimony from vocational expert Whitford, finding Hancock could perform the jobs of a linen room attendant, a laundry worker I and a box bender. (R. at 86.) According to the DOT, the linen room attendant job requires

a reasoning level of 3.[11] *See* DICTIONARY OF OCCUPATIONAL TITLES, ("DOT"),
Linen-Room Attendant, 222.387-030 (4th ed. rev. 1991). The DOT assigns each job
a reasoning level "ranging from Level 1 (which requires the least reasoning ability)
to Level 6 (which requires the most)." *Ferguson v. Berryhill*, 381 F. Supp. 3d 702,
708 (W.D. Va. 2019) (quoting *Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015)).
The DOT specifies a reasoning level of 2 for the laundry worker I job. *See* DOT,
Laundry Worker I, 361.684-014. The ALJ's hypothetical question to the vocational
expert assumed an individual who, among other things, was limited to the
performance of simple, routine tasks with simple, short instructions and simple
work-related decisions, a finding included in the ALJ's ultimate residual functional
capacity finding. (R. at 16, 84-86.) Hancock argues there is an apparent conflict left
unresolved by the ALJ between Whitford's testimony that he could perform the jobs
of a linen room attendant and a laundry worker I, given his residual functional
capacity as found by the ALJ and presented in the hypothetical on which Whitford's
testimony was based. For the reasons that follow, I find that an apparent conflict
exists that went unresolved by the ALJ. However, I further find that such error was
harmless.

The Selected Characteristics of Occupations Defined in the Revised
Dictionary of Occupational Titles, ("SCO"),[12] defines a reasoning level of 2 as
"[a]pply[ing] commonsense understanding to carry out detailed but uninvolved
written or oral instructions. Deal with problems involving a few concrete variables
in or from standardized situations." DOT, Vol. II, App. C, § III. A reasoning level
of 3 is defined as "[a]pply[ing] commonsense understanding to carry out instructions

---

[11] While Hancock argues that the linen room attendant job is classified as requiring a
reasoning level of 2 by the DOT, it actually is classified as requiring a reasoning level of 3.

[12] The SCO is a companion publication to the DOT.

furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." DOT, Vol. II, App. C, § III. Hancock argues that the vocational expert's testimony that he could perform jobs requiring reasoning levels 2 and 3 is inconsistent with his residual functional capacity, as found by the ALJ, which aligns with a reasoning level of 1. A reasoning level of 1 is defined as "[a]pply[ing] commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." DOT, Vol. II, App. C, § III. This court, as well as other district courts and two appellate courts, have held that there is an apparent conflict between a limitation to simple, routine or repetitive tasks and the requirements of level 3 reasoning. *See Zavalin*, 778 F.3d at 846-47; *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005); *Ferguson*, 381 F. Supp. 3d at 708-09; *Graham-Willis v. Colvin*, 2013 WL 6840465, at *7 (D. S.C. Dec. 27, 2013) (collecting cases). Along similar lines, the Fourth Circuit has held that a limitation to "short and simple instructions" apparently conflicts with jobs requiring a reasoning level of 3. *Keller v. Berryhill*, 754 F. App'x 193, 197 (4th Cir. 2018). The Fourth Circuit also has held that a limitation to the performance of "short, simple instructions" apparently conflicts with a reasoning level of 2. *Thomas v. Berryhill*, 916 F.3d 307, 313-14 (4th Cir. 2019).

This case is strikingly similar to *Hudgins v. Berryhill*, 2018 WL 1474558 (W.D. Va. Feb. 12, 2018), adopted by 2018 WL 1474086 (W.D. Va. Mar. 26, 2018). In that case, the ALJ testified the plaintiff was capable of working as an assembler, a packer and an inspector/tester/sorter. Both the jobs of a packer and an inspector/tester/sorter required a reasoning level of 2. However, the ALJ's residual functional capacity finding limited Hudgins to jobs that required him to carry out only simple instructions. The job of an assembler required a reasoning level of 1,

which the court found consistent with Hudgins's residual functional capacity. The vocational expert testified there were more than 10,000 assembler jobs in the national economy. In *Hudgins*, the court found the ALJ committed a *Pearson* violation when he failed to identify and resolve the apparent conflict between the vocational expert's testimony and the requirements of the jobs of a packer and an inspector/tester/sorter established by the DOT. *See* 2018 WL 1474558, at *6. Specifically, the court noted that there was no evidence the ALJ considered the issue, made any attempt to resolve it or reconcile it with the inconsistency in the DOT. *See Hudgins*, 2018 WL 1474558, at *6. I find that the same is true here. While the ALJ asked Whitford whether his testimony conflicted with the DOT, he did not discharge his duty to resolve the apparent conflict between Whitford's testimony that Hancock could perform jobs requiring reasoning levels of 2 and 3, despite the ALJ's hypothetical, and ultimate residual functional capacity finding, reflecting limitations consistent with a reasoning level of 1. Nonetheless, for the reasons that follow, I find that this error by the ALJ was harmless.

As in *Hudgins*, Whitford identified a job that a hypothetical individual limited to a reasoning level of 1 could perform that existed in significant numbers in the national economy. Thus, I find, as did the court in *Hudgins*, that the ALJ's failure to identify and resolve the apparent conflict was harmless error. *See* 2018 WL 1474558, at *6 (citing *Collins v. Berryhill*, 2018 WL 278667, at *4 (M.D. N.C. Jan. 3, 2018) ("Even if the ALJ failed to identify and resolve any apparent conflicts between the DOT and the VE's testimony …, any such failure is harmless error as there was at least one other job identified that Plaintiff could perform. …")); *see also* 20 C.F.R. § 416.966(b) ("[I]f work that you can do does exist in the national economy, we will determine that you are not disabled."). Specifically, Whitford testified such an individual could perform the job of a box bender, of which there were 20,000

positions in the national economy. While Hancock's brief alludes that this is an insufficient number to meet the step five requirement of a "significant number," the court cannot agree. In *Hudgins*, 10,000 national jobs was deemed a significant number. *See* 2018 WL 1474558, at *5-6. In this case, the vocational expert proffered an occupation with twice that amount of jobs in the national economy.

For all these reasons, while I find the ALJ erred by failing to identify and resolve an apparent conflict between the vocational expert's testimony and the DOT, I, nonetheless, find that such error was harmless, and the ALJ's reliance on the vocational expert's testimony is supported by substantial evidence.

Next, Hancock argues the ALJ erred by failing to adequately develop the record regarding his educational background and work experience. (Plaintiff's Brief at 8-11.) Again, however, I am not persuaded. Specifically, Hancock argues the ALJ had a duty to further explore his history of special education, as well as some issues regarding his reading and writing abilities. Additionally, he argues the ALJ was obligated to further explore his brief period of work at a fast food restaurant in 2018, as well as other jobs, which the ALJ deemed were not substantial gainful activity. It is well-settled that the ALJ has a duty to develop the record, meaning he must "explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (citations omitted). However, the ALJ's duty to develop the record is discharged as long as "the record is adequate to make a determination regarding a disability claim." *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000); *Kersey v. Astrue*, 614 F. Supp. 2d 679, 69394 (W.D. Va. 2009) (citing *Cook*, 783 F.2d at 1173). "The regulations require only that the medical evidence be 'complete' enough to

make a determination regarding the nature and severity of the claimed disability, the duration of the disability and the claimant's residual functional capacity." *Kersey*, 614 F. Supp. 2d at 693-94 (citing 20 C.F.R. §§ 404.1513(e), 416.913(e)). To prevail on his argument, Hancock must show there was an evidentiary gap that was prejudicial to him and that he could and would have provided evidence that might have changed the outcome. *See Blankenship v. Astrue*, 2012 WL 259952, at *13 (S.D. W.Va. Jan. 27, 2012); *see also Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980).

Here, I find there are no such prejudicial evidentiary gaps. Specifically, pertaining to his educational background, the ALJ sufficiently questioned Hancock about his schooling, as well as any deficits in reading and writing. In response to the ALJ's inquiry, Hancock testified the highest grade completed was twelfth grade and that he was in special education. (R. at 62.) When the ALJ followed up by asking Hancock if he had any problems reading and writing, he testified he could sign his name, but it was "chicken scratch," and he could read letters sent to him by the Social Security Administration, although he could not fully understand them. (R. at 62-63.) Hancock testified his wife helped him read these letters. (R. at 63.) When the ALJ asked whether he could make change, Hancock responded, "No, sir," but then he said, "Barely." (R. at 63.) He stated he had a checking account on one occasion, but his mother managed it. (R. at 63.) Thus, the ALJ correctly found Hancock had a high school education. While there is evidence in the record that Hancock participated in special education classes, this evidence, as provided by Hancock, is inconsistent throughout the record, as previously noted. The ALJ's duty to develop the record does not transform him into a claimant's counsel, and the ALJ "has the right to assume that counsel is presenting the claimant's strongest case for benefits." *Blankenship*, 2012 WL 259952, at *13 (citations omitted). Hancock offered nothing

either at the hearing or in his objection to the ALJ's decision, to contradict or clarify that which the ALJ considered. For instance, as noted above, he verified he completed high school. He also testified he was a certified mason, and there is a statement in the record that he passed his driver's test unassisted, indicating an ability to read and understand. He also reported in October 2019 he was in charge of the household finances, undermining his statements that he could barely make change and that his mother managed the only checking account he ever had. If Hancock wished to provide any further information relevant to his educational background, he would have presented it at the hearing or in his brief to this court through counsel. However, he did not do so. He also did not provide any school records for the ALJ's consideration. Instead, he merely states the ALJ should have further developed his "special education" and his "problems reading and writing," without further elaboration or argument. As stated above, however, the ALJ's duty to adequately develop the record does not transform him into Hancock's counsel. *See Blankenship*, 2012 WL 259952, at *13.

Regarding his work history, Hancock argues the ALJ erred by considering only his work at the composite job of a general laborer and a forklift truck operator. While Hancock worked at a fast food restaurant for a couple of weeks in 2018 after his alleged onset date, the ALJ correctly found this did not constitute substantial gainful activity, as did none of his other work. If a claimant is able to engage in substantial gainful activity during a period relevant to his disability claim, he will be found not disabled. *See* 20 C.F.R. § 416.971 (2020). Thus, it was important for the ALJ to determine that Hancock's fast food job in 2018 did not constitute substantial gainful activity. However, the ALJ will consider all of a claimant's work activity during the period relevant to an individual's disability claim to determine whether he has the ability to perform substantial gainful activity. *See* 20 C.F.R. § 416.971.

The regulations define substantial gainful work activity as that involving significant physical or mental activities and which is performed for pay or profit. *See* 20 C.F.R. § 416.972(a)-(b) (2020). At step four of the sequential evaluation process, the ALJ must determine if a claimant can perform any of his past relevant work, given his residual functional capacity. *See* 20 C.F.R. § 416.920(a)(4)(iv) (2020). The only past relevant work Hancock had was the composite job. Thus, the ALJ was required to gather information about this job in order to compare it to Hancock's residual functional capacity. All of this being the case, I cannot find that the ALJ failed to adequately develop the record pertaining to Hancock's work history. He considered Hancock's past relevant work and whether he performed any substantial gainful activity during the relevant period, as he was obligated to do under the regulations. The court notes that nothing prevented Hancock's counsel from eliciting information about Hancock's other work either at the hearing or in the brief to the Appeals Council. However, no such testimony was elicited, and no such argument was made. As stated previously, an ALJ's duty to develop the record does not transform the ALJ into counsel for a claimant, and the ALJ may presume that a claimant has presented his strongest case. *See Blankenship*, 2012 WL 259952, at *13; *see also Laney v. Astrue*, 2011 WL 11889, at *11 (S.D. W.Va. Jan. 4, 2011) (citing *Nichols v. Astrue*, 2009 WL 2512417, at *4 (7th Cir. 2009)). Additionally, the Commissioner correctly argues in her brief that it is the claimant who bears the risk of nonpersuasion. *See Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976).

Moreover, even assuming the ALJ erred by failing to develop the record regarding either Hancock's educational background or his work history, Hancock has not shown he was prejudiced by such error. *See Ludwig v. Astrue*, 681 F.3d 1047, 1054 (9th Cir. 2012) (reversal on account of an error is not automatic but requires a

finding of prejudice) (citing *Shinseki v. Sanders*, 556 U.S. 396, 407-09 (2009) (recognizing claimant has burden of showing error is harmful)).

For all these reasons, I find the ALJ did not err by failing to adequately develop the record with regard to Hancock's educational background or his work history.

Lastly, Hancock argues the ALJ erred by failing to properly consider the opinion of consultative examiner Fields, as well as the sworn statement from his wife. With regard to the 10-page sworn statement submitted in lieu of his wife's testimony at his January 2020 hearing, I first note that, under the regulations, the ALJ is not required to articulate how evidence from nonmedical sources was considered. *See* 20 C.F.R. § 416.920c(d) (2020). The regulations define a nonmedical source to include family members. *See* 20 C.F.R. § 416.902(j)(4) (2020). In considering evidence from nonmedical sources like spouses, it is appropriate for the ALJ to consider certain factors, including whether the evidence is consistent with other evidence and any other factors that tend to support or refute the evidence. *See* S.S.R. 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006). In *Gray v. Colvin*, 2014 WL 4660792 (W.D. Va. Sept. 17, 2014), this court found it unnecessary for the ALJ to specifically reference the testimony of the claimant's mother and girlfriend because it was repetitive of the claimant's discredited allegations and inconsistent with other evidence in the medical record. In *Gray*, the court held the ALJ need not undertake the impossible task of mentioning every piece of evidence placed in the administrative record, but he must "articulate his assessment of the evidence to permit meaningful judicial review, which must include specific reference to the evidence producing his conclusion." 2014 WL 4660792, at *8 (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)). Additionally, the Fourth Circuit has held

that it is unnecessary to discuss the testimony of a lay witness where it is inconsistent with other evidence in the record. *See Laws*, 368 F.2d at 644.

Here, as in *Gray*, the ALJ did not reference the sworn statement of Hancock's wife in his decision. However, like the lay witness testimony in *Gray*, I find it was repetitive of Hancock's discredited subjective complaints and inconsistent with other evidence in the record. Specifically, this statement contains a reiteration of Hancock's allegations that he suffered from mood swings; depression; anxiety; angry outbursts; memory issues; paranoia; auditory hallucinations; OCD symptoms; difficulty focusing; difficulty following directions; difficulty getting along with others; sleep issues; suicidal ideations; and limited social functioning. Thus, it is cumulative of evidence already contained in the record. Moreover, I find that the severity of such allegations is inconsistent with and contradicted by the record. For instance, when Hancock was compliant with prescribed treatment, the majority of his mental status examinations revealed normal to minimal findings. In June 2018, when he was discharged from a psychiatric hospitalization, Hancock exhibited guarded behavior and speech, slow but fair judgment, full orientation, unimpaired attention and concentration, logical thought process, no delusions, and he denied suicidal ideations. In August 2018, he had a normal mood, impulse control and thought process, full orientation, normal memory and fair judgment and insight. He reported normal energy levels and good sleep, an improving appetite with a medication change, and he reported doing well and looking forward to his upcoming wedding. In a discharge note from Pathways, dated January 2019, it was noted that Hancock was not receptive to referral information to mental health providers to where he was moving in Virginia. In April 2019, he was alert and oriented with an appropriate affect and demeanor. In July 2019 his examination remained largely unchanged. In October 2019, Hancock reported feeling depressed, poor sleep,

difficulty concentrating and suicidal ideation, but he said he had been off his medications for two months. Nonetheless, on examination, he reported a current good mood, he denied anxiety and depression on that day, eye contact, insight, speech and judgment were normal, and he reported auditory hallucinations and paranoia, but he was fully oriented and denied suicidal ideations.

Moreover, Hancock has failed to identify any statute or decision in the Fourth Circuit compelling a contrary conclusion. Due to this failure, as well as the repetitive nature of the evidence and its inconsistency with the record, I cannot find that the ALJ erred by not including a discussion of the information contained in this sworn statement in his decision.

Regarding consultative examiner Fields, Hancock argues, in part, that the ALJ erred by failing to address her opinion that his blunted affect and typical one-word responses impacted his social functioning, given Hancock's allegation of having difficulty getting along with and trusting others.

In reaching his finding that Hancock was not disabled, the ALJ found Fields's opinion that Hancock had marked limitations and likely would be unable to interact appropriately with others or complete a normal workday to be "not persuasive."[13] (R. at 18.) In particular, the ALJ found such findings were unsupported by both Fields's own examination findings, as well as those of Hancock's own providers. (R. at 18.) I find that the ALJ's statement, however, is not supported by the record. While Fields's findings on mental status examination of Hancock were rather minimal, she specifically noted that Hancock had a paranoid presentation. (R. at

---

[13] Because Hancock filed his claim after March 27, 2017 the "new regulations" for considering opinion evidence, found at 20 C.F.R. § 416.920c, apply to this case.

972.) She specifically documented a blunted affect with one-word responses. (R. at 972.) As a result, Fields opined Hancock would have difficulty interacting appropriately with others. (R. at 972.) In fact, she found Hancock's ability to do so was markedly limited. (R. at 976.) Despite the ALJ's statement, this opinion is supported by Hancock's description to Fields of impaired social functioning and Fields's own observations.

The record also does not support the ALJ's finding that Fields's opinion was inconsistent with the examination findings of his own medical providers. In fact, numerous mental health providers who have treated Hancock have documented some problem with social interaction. In May 2018, Hancock reported having very few friends, staying to himself, paranoia and thinking people were out to get him. (R. at 361.) Hancock's Work and Social Adjustment Scale score at that time indicated moderately severe to severe impairment. (R. at 352.) Hancock reported not wanting to leave his home due to paranoia and periods of anger, during which he would throw and break things. (R. at 400.) He later reported self-isolation and irritability. (R. at 405.) In June 2018, Hancock told his social worker he had no social life. (R. at 368-69.) In July 2018, Hancock reported he had a quick temper. (R. at 499.) In October 2018, it was again documented that Hancock gave only one- or two-word responses. (R. at 805.)

Also, when Hancock was admitted for inpatient psychiatric treatment in June 2018, it was noted that he was guarded, uncooperative and agitated. (R. at 327.) He also had behavioral outbursts. (R. at 327.) Furthermore, while Dr. Casey's statements that Hancock was psychiatrically disabled may not be controlling, they are not inconsistent with Fields's opinions. Fields's opinions also are consistent with the state agency psychologist Dempsey's opinion that Hancock was moderately

limited in his ability to interact with others or work in coordination or proximity to others. (R. at 94, 96-98.)

For these reasons, I find that the ALJ's consideration of the psychological opinion evidence is not supported by the record.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The ALJ's error by failing to identify and resolve an apparent conflict between the vocational expert's testimony and the DOT was harmless;

2. The ALJ adequately developed the record regarding Hancock's educational background and work history;

3. Substantial evidence does not exist in the record to support the ALJ's consideration of consultative examiner Fields's opinion;

4. Substantial evidence does not exist in the record to support the ALJ's residual functional capacity finding; and

5. Substantial evidence does not exist in the record to support the Commissioner's finding that Hancock was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hancock's motion for summary judgment, deny the Commissioner's motion for summary judgment and remand the case to the Commissioner for further development.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    August 10, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

- 39 -